**FILED**

**JUNE 10, 2016**

**TN COURT OF
WORKERS' COMPENSATION
CLAIMS**

**Time 8:19 AM**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT JACKSON

| | | |
|---|---|---|
| STEVEN HALL, | ) | Docket No.: 2015-07-0203 |
|     Employee, | ) | |
| v. | ) | |
| | ) | State File Number: 70653-2014 |
| | ) | |
| MID-SOUTH INDUSTRIAL, INC., | ) | |
|     Employer, | ) | Judge Allen Phillips |
| | ) | |
| And, | ) | |
| | ) | |
| PHOENIX INS. CO., | ) | |
|     Insurance Carrier. | ) | |
| | ) | |
| | ) | |

## COMPENSATION HEARING ORDER
## FOR DISABILITY AND MEDICAL BENEFITS

This matter came before the undersigned workers' compensation judge for a Compensation Hearing on May 23, 2016, pursuant to Tennessee Code Annotated section 50-6-239 (2015). Mr. Hall requested permanent disability benefits, temporary disability benefits, payment of past and future medical benefits, and discretionary costs.[1] Mid-South contended Mr. Hall failed to establish his injury arose out of his employment. Alternatively, if Mr. Hall established causation, then he failed to prove entitlement to all of the claimed temporary disability benefits and, should be limited to permanent disability benefits based upon the treating physician's rating. Accordingly, the central legal issues are: (1) whether Mr. Hall proved a compensable injury; and, if so, (2) the extent of benefits to which he is entitled. For the following reasons, the Court finds Mr. Hall proved a compensable injury and is entitled to temporary disability, permanent disability, and medical benefits as specifically set forth below.

---

[1] The Petition for Benefit Determination also requested "attorney's fees" under the list of "disputed issues."

## History of Claim

Mr. Hall is a fifty-five-year-old resident of Gibson County, Tennessee, who worked for Mid-South as a millwright. (T.R. 1.) On September 3, 2014, while working at a jobsite in Alcoa, Tennessee, he "drug" his left foot across a concrete floor to move some debris. Mr. Hall testified he felt a "pop" in his left knee that resulted in immediate pain and locking of the knee. Afterwards, he was unable to walk under his own power, and other employees assisted him to a first aid station.

Mid-South provided medical services in Alcoa. No records from this treatment are in evidence. However, Mr. Hall's history to subsequent providers reveals he went to a minor medical clinic, a local emergency room, and another provider who recommended an MRI of the left knee. The MRI revealed a complex medial meniscus tear, which the radiologist described as a "bucket handle tear with fragment displaced anteriorly." (Ex. 8 at ex. 2, p. 1). The last provider in Alcoa recommended an orthopedic referral and placed sedentary work restrictions.

After his return to West Tennessee, Mid-South provided Mr. Hall light duty beginning September 15, 2014. Mr. Hall testified Bill Carlisle, Mid-South's HR Manager, told him Mid-South would accommodate his sedentary restrictions to avoid paying workers' compensation benefits. Mr. Hall worked repairing tools, remained on crutches, and continued his medication.

Mid-South terminated Mr. Hall on October 2, 2014, for "attendance problems." (*See* Ex. 11.) At the hearing, Mid-South did not offer specific evidence of the days Mr. Hall missed that led to his termination, but the attendance records indicate he did not work on September 30, October 1, or October 2, 2014. (Ex. 10.) The attendance records also indicate he worked limited hours during the entire period of light duty. Mr. Hall did not have specific recollection of the dates he worked limited hours. However, he stated if he left early or failed to come to work, it would have been due to his left knee. Mr. Carlisle told him to "call in" to Mid-South if he needed to miss work. Mr. Hall testified he always called Mr. Carlisle or "the secretary" if he were absent. On cross-examination, he claimed Mr. Carlisle told him on one specific occasion he did not have to report to work after being involved in an accident. According to Mr. Hall, Mid-South did not complain about his job performance or discipline him during his light-duty period.

Jim Bracamonte, Mid-South's safety director, testified he was aware of Mr. Hall's knee injury and restrictions. He stated Mid-South could have continued accommodation of Mr. Hall's sedentary work restrictions had he not been terminated for "attendance issues." Mid-South had accommodated other employees on restrictions. Mid-South's termination of Mr. Hall related neither to his knee injury nor to his filing of a workers' compensation claim.

2

Mr. Bracamonte confirmed Mid-South's handbook provided it could discipline employees for three unexcused absences "up to and including termination." (Ex. 4.) An unexcused absence is one where the employee fails to advise Mid-South of his anticipated absence or where he leaves work early. Excused absences include absences due to sickness. All absences, both those resulting from not reporting to work and those resulting from leaving early, require the employee to advise Mid-South. If not reporting to work, the employee must call before the start of the workday. (Ex. 4.)

Mr. Bracamonte did not have personal knowledge of why Mr. Hall failed to report or leave early on all of the dates he missed during the light-duty period. He was unable to "point" to a day "for certain that [Mr. Hall] did not report." Accordingly, Mr. Bracamonte could not dispute Mr. Hall's reasons why he missed work. He noted Mr. Carlisle, the human resources manager, is responsible for discipline.

After his termination, Mid-South provided Mr. Hall a panel of physicians to evaluate his knee. (Ex. 2.) He chose Dr. David Pearce, an orthopedic surgeon, whom he first saw on October 10, 2014. (Ex. 12 at 8.) Mr. Hall told Dr. Pearce that, "he was at work and using a sweeping motion with his leg, then felt a pop in his knee." *Id.* at 8-9. Dr. Pearce confirmed the initial diagnosis of a torn meniscus. After examination, Dr. Pearce injected Mr. Hall's knee to "decrease pain." (Ex. 12 at 17.) He recommended an arthroscopic repair of the torn meniscus and continued the sedentary work restrictions. *Id.* at 16 and ex. 4. In his office note, Dr. Pearce stated the "meniscal pathology" does not "seem as likely to have caused [the] injury or the mechanism that he reports and certainly he has a previous history with that knee." (Ex. 12 at ex. 1, p. 2.) On a "Provider Form" from that date, Dr. Pearce checked boxes next to both the "work-related" and "pre-existing condition" options. *Id.* at ex. 4.

After the initial visit to Dr. Pearce, Mid-South denied Mr. Hall's claim based upon a "pre-existing condition." (Ex. 3.) Mr. Hall then sought care on his own. On February 10, 2015, he saw Dr. Bradford Wright, an orthopedic surgeon. (Ex. 7 at 5.) Mr. Hall gave a history that "he was raking something on the ground, and his foot caught and he heard a pop." *Id.* Mid-South emphasized on cross-examination of Dr. Wright that Mr. Hall did not report to other providers that his foot "caught" on anything but that he simply "drug" it across the floor. *Id.* at 30-31. At the first visit, Dr. Wright diagnosed a torn meniscus and recommended arthroscopic surgery. *Id.* at 8.

The next week, on February 16, 2015, Mr. Hall obtained employment at H&M Construction in Jackson as a plumber. The job paid him twenty-three dollars per hour, which was more than he earned at Mid-South. H&M required him to "lay out work for others" and to perform "smaller" jobs as his knee allowed.

On March 9, 2015, Dr. Wright performed an arthroscopic partial meniscectomy of Mr. Hall's left knee. (Ex. 7 at 8.) Following surgery, Dr. Wright completely restricted

Mr. Hall from work. However, Mr. Hall returned to H&M on April 7, 2015, before his full release from Dr. Wright. He testified he did so because he needed income. Dr. Wright placed Mr. Hall at maximum medical improvement (MMI) on May 26, 2015.

Regarding causation, Dr. Wright opined in a letter "To Whom It May Concern" that, "I do feel that it is more likely than not that the injury occurred at work at that time described by the patient. This does tend to fit historically and also the findings at surgery fit the history given by the patient." (Ex. 7 at ex. 3.)

Further, Dr. Wright testified that, "[I] have no reason not to believe that this injury occurred the way he described it and when he described it to me." *Id.* at 14. "[I]t would have been an acute injury just like he described where he twisted his knee, he heard and felt a pop and then had problems afterwards." *Id.* at 16. In summary, he testified that when "talking about this 51 percent thing which is really splitting hairs trying to say which side of this do we fall. All I can say is what I was given and what I saw, and what I saw on physical examination, how I responded, it was consistent." *Id.* at 32.

Dr. Wright felt Mr. Hall had a "good" result from the surgery. *Id.* at 24. He assessed a one percent permanent partial impairment to the body based upon a partial meniscectomy pursuant to Table 16-3 on page 509 of the Sixth Edition of the American Medical Association's Guides to the Evaluation of Permanent Impairment ("AMA Guides"). *Id.* at 26-27. He testified his own charges, those of the hospital where he performed surgery, and those of the anesthesiologist were reasonable and related to Mr. Hall's injury. *Id.* at 12-13.

In his deposition, Dr. Pearce described a "bucket handle tear" as "a bigger tear [that] implies a bigger level of trauma." (Ex. 12 at 9.) Namely, a patient has "to kind of tear the meniscus and then displace it profoundly . . . it takes a lot of force to keep it intact and then to tear it . . . a tough tear to have with that mechanism [referring to Mr. Hall's description of injury]." *Id.* at 9-10. The type of force typically implicated in such meniscal tears comes from "twisting, pivoting, and squatting." *Id.* at 11. Whether the foot "catches" anything is irrelevant; it is the "mechanism of force that was directed with the sweeping motion that's important." *Id.* at 32.

When specifically asked if Mr. Hall's "knee injury was caused by his work injury," Dr. Pearce replied, "Not as he described it, no." *Id.* at 18. He stated the work event was not the "primary cause" of the meniscal tear. *Id.* at 37. Dr. Pearce also opined that the osteoarthritis, characterized by "joint space narrowing" seen on x-rays of both knees taken on October 10, 2014, was not related to the incident. *Id.* at 22-23. However, he did state that, "you can get a progression of arthritis after a meniscal tear." *Id.*

Mr. Hall saw Dr. Samuel Chung on September 3, 2015, for an independent medical evaluation arranged by his attorney. (Ex. 8 at 16.) Dr. Chung recorded a history

4

that Mr. Hall, "was using his left leg to push some debris on the floor when his left knee popped and twisted." *Id.* at 6. He noted Mr. Hall saw Dr. Pearce but "due to some misunderstanding and poor communication" Mr. Hall asked for a "second opinion." *Id.* On examination, Dr. Chung noted crepitation and diminished range of motion. *Id.* at 8-9. On an x-ray obtained for his evaluation, Dr. Chung noted a "2 mm [cartilage interval] at the left patellofemoral line." *Id.* at ex. 2, p. 3. He diagnosed "residual [sic] from left knee injury requiring surgical intervention with ongoing symptomatology." *Id.* at 11-12.

Dr. Chung assessed a five percent permanent partial impairment to the body as a whole. (Ex. 8 at 13.) He based his rating on Table 16-13, page 511 of the AMA Guides due to "patellofemoral arthritis" with a "two millimeter cartilage interval." *Id.* at 12. Dr. Chung utilized this methodology because Mr. Hall "continued to experience persistent clinical symptoms of patellofemoral arthritis which resulted from the injury and the outcome of the injury." *Id.* at 14. On cross-examination, he conceded he did not know what degree of diminished cartilage interval pre-existed the injury. *Id.* at 33. Dr. Chung also admitted the AMA Guides contain a rating for a "partial meniscectomy." *Id.* at 34.

Regarding causation, Dr. Chung testified, "when [the] patient was kicking the debris using his left leg as he was pushing some debris, I believe there was a [sic] injury to his left knee when [the] left knee popped, and of course, the twisting torque caused the meniscus of the knee to tear." (Ex. 8 at 15.) Accordingly, he believed the injury "arose primarily" from the employment when "all other possible causes are considered." *Id.* As with its cross-examination of Dr. Wright, Mid-South also confronted Dr. Chung with Mr. Hall's history to providers of not having "caught" his foot on anything but simply dragging his foot when injured. *Id.* at 40.

Mid-South provided a follow-up appointment with Dr. Pearce on October 14, 2015, to evaluate Mr. Hall's post-surgical condition. (Ex. 12 at 18.) A "Review of Systems" form on that date indicates Mr. Hall had "no pain;" Mr. Hall testified he did not recall making such statement. At that visit, Dr. Pearce performed an examination and, based upon the AMA Guides, Table 16-3, page 509, opined Mr. Hall had a one percent permanent partial impairment to the body as a whole due to "a partial medial meniscectomy." *Id.* at ex. 2 at 2. "Less than 10%" of the impairment was related to the work event and the remainder to pre-existing conditions. *Id.* Dr. Pearce reviewed the x-ray from September 3, 2015, relied upon by Dr. Chung. He opined it did not support impairment for patellofemoral arthritis because, "the x-ray which you [Mid-South's counsel] showed me does not provide an appropriate assessment of the patellofemoral joint in any way, shape or form." *Id.* at 27. Thus, the x-ray does not show patellofemoral joint space narrowing of two millimeters. *Id.* at 29.

Mr. Hall felt he obtained a favorable result from the surgery but still has problems with "walking a lot" and notes increased pain "when the weather changes." He does not believe he could perform the heavy lifting, climbing, and squatting required of a

millwright. On a "good" day, his pain level is a "two;" on a bad day, it is an "eight." He cannot use a "push mower" and feels hunting is "too strenuous." Mr. Hall continued working for H&M until "September or October" 2015 until being laid off.

Melanie Hall, Mr. Hall's wife and a registered nurse, corroborated Mr. Hall's prior rheumatoid arthritis was concentrated in his hands and elbows. He never had left knee issues. Mrs. Hall noted, after the September 3, 2014 injury, Mr. Hall was on crutches and unable to walk. His knee prevented him from working on several occasions during the light-duty period at Mid-South.

Based upon this evidence, Mr. Hall contended he established causation of his injury by a preponderance of the evidence. First, the parties stipulated the event occurred. Second, Drs. Wright and Chung provided causation. Finally, Dr. Pearce opined causation was lacking only because Mr. Hall did not use the right words in describing his injury while agreeing that "something" happened. Moreover, Dr. Pearce indicated on the first "Provider Report" he completed that the injury was work-related. Finally, though Dr. Pearce was an "approved" physician, whether he is truly a "treating" physician is a "question of fact." Dr. Wright is the true "treating" physician.

Next, Mr. Hall argued Mid-South failed to present any evidence that he failed to call in or to advise he needed to leave early because of his knee. Mr. Carlisle did not testify, and Mr. Bracamonte had no personal knowledge of discussions between Mr. Hall and anyone else at Mid-South. Therefore, there is inadequate proof Mid-South terminated Mr. Hall for cause.

Finally, Mr. Hall argued Dr. Chung's rating of five percent to the body is the more accurate rating because the lingering problems Mr. Hall is having with his left knee are more in keeping with arthritic issues.

Mid-South contended Dr. Pearce is the approved physician and his opinion is presumed correct. His opinion is Mr. Hall's knee injury is not related to the work event because the mechanism of injury is inconsistent with a torn meniscus. The current law prohibits a liberal interpretation of the facts in favor of Mr. Hall. Further, Tennessee authority holds the mere presence of an employee at the work place at the time of injury does not compel a finding of compensability.

In the alternative, Mid-South argues if Mr. Hall proved causation, then he cannot recover temporary disability benefits because of his termination for cause at a time when light duty was available. Mid-South may enforce its workplace rules without penalty.

### Findings of Fact and Conclusions of Law

At this compensation hearing, Mr. Hall has the burden of proving all essential

6

elements of his claim by a preponderance of the evidence. Tenn. Code Ann. § 50-6-239(c)(6) (2015); *Scott v. Integrity Staffing Solutions,* No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015).

*Causation*

To be compensable, Mr. Hall must show his injury arose primarily out of and in the course and scope of his employment and that it is identifiable by time and place of occurrence. Tenn. Code Ann. § 50-6-102(13)(A) (2015). Because the parties do not contest the occurrence of the incident, the issue becomes medical causation.

To prove medical causation Mr. Hall must show, to a reasonable degree of medical certainty, that the incident "contributed more than fifty percent (50%) in causing the . . . disablement or need for medical treatment, considering all causes." Tenn. Code Ann. § 50-6-102(14)(C) (2015). "Shown to a reasonable degree of medical certainty" means that, in the opinion of the treating physician, it is more likely than not considering all causes as opposed to speculation or possibility. Tenn. Code Ann. § 50-6-102(14)(D) (2015). The opinion of the treating physician, selected by the employee from a panel designated by the employer is presumed correct on the issue of causation subject to rebuttal by a preponderance of the evidence. Tenn. Code Ann. § 50-6-102(14)(E) (2015).

The Court finds Mr. Hall has shown his injury primarily arose out of his employment and is more likely than not related to the incident of September 3, 2014. In so finding, the Court notes Dr. Wright specifically testified: "I do feel that it is more likely than not that the injury occurred at work at that time described by the patient." (Ex. 7 at ex. 3.) He based his opinion on Mr. Hall's history that he moved his leg in the manner described and, "it would have been an acute injury just like he described where he twisted his knee, he heard and felt a pop and then had problems afterwards." *Id.* at 16. Mr. Hall testified he did not have problems with his left knee before the incident, but he had immediate and ongoing problems following the incident. The lay testimony of an employee is relevant to the issue of causation. Tennessee law has long held that medical testimony is not to be "read and evaluated in a vacuum." *Thomas v. Aetna Life & Cas. Co.,* 812 S.W.2d 278, 283 (Tenn. 1991). Instead, the medical proof "must be considered in conjunction with the lay testimony of the employee as to how the injury occurred and the employee's subsequent condition." *Id.* Mr. Hall testified he had no knee problems and was able to work before the incident, and the Court believes him.

Mid-South argues the applicability of *Willis v. All Staff,* No. 2014-05-0005, 2015 TN Wrk. Comp. App. Bd. LEXIS 42 (Tenn. Workers' Comp. App. Bd. Nov. 9, 2015). The Court disagrees. There, the employee suffered a dislocated patella and torn ligament in his knee when standing from a squatting position. *Id.* at *2. The only medical testimony was that the injury "could be" related or "possibly" was related to the incident. *Id.* at *23. Our Appeals Board held such testimony did not establish the injury arose

7

primarily out of the employment. *Id.* at *26. In this case, both Dr. Wright and Dr. Chung testified Mr. Hall's injury arose primarily out of the employment.

Mid-South correctly points out a trial court may choose to accredit one expert over another in the case of conflicting opinions. *Brees v. Escape Day Spa & Salon*, No. 2014-06-0072, 2015 TN Wrk. Comp. App. Bd. LEXIS 5 (Tenn. Workers' Comp. App. Bd. Mar. 12, 2015). Further, in evaluating which opinion to accept, the Court may consider the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of that information through other experts. *Id.* at *14 *citing Orman v. Williams Sonoma, Inc.,* 803 S.W.2d 672, 676 (Tenn. 1991).

Applying those standards to this case, the Court accredits Dr. Wright's opinion. He is an orthopedic surgeon who actually treated and had the most contact with Mr. Hall. Dr. Wright had ample opportunity to consider the clinical situation, and he actually viewed the injured knee during surgery. He based his opinion upon application of his findings to the history given him and found no reason to doubt Mr. Hall. Additionally, Dr. Chung corroborates his causation opinion. Even if Dr. Pearce were an authorized physician whose opinion is entitled to a presumption of correctness, the Court finds such presumption is rebutted by a preponderance of the evidence.

In making its findings, the Court also notes Mid-South's thorough exploration of whether Mr. Hall "caught" his foot on something. However, Dr. Pearce testified, "whether the foot 'catches' anything does not matter; it is the mechanism of force that was directed with the sweeping motion that's important." *Id.* at 32. The Court finds the preponderance of the medical evidence supports causation.

*Past Medical Benefits*

In *Young v. Young Electric*, No. 2015-06-0860, TN Wrk. Comp. App. Bd. LEXIS 24, at *16 (Tenn. Workers' Comp. App. Bd. May 25, 2015), our Appeals Board noted that, "[i]t is well-settled that an employer is legally obligated to provide to an injured employee reasonable and necessary medical treatment that is causally-related to the work accident." *See* Tenn. Code Ann. § 50-6-204(a)(1)(A) (2015). Further, the Board reminded that, in circumstances where an employer refuses to provide medical treatment or denies the employee's claim, such employer bears the risk of being held responsible for medical expenses incurred by the employee in the event the claim is deemed compensable. *Id.* at *16.

In the present case, Mr. Hall established his injury arose primarily out of his employment with Mid-South. Accordingly, Mid-South was obligated to provide him medical benefits. As instructed by *Young*, Mid-South ran the risk of being held responsible for the medical expenses Mr. Hall incurred in seeking treatment on his own in the event the claim is compensable. The Court finds Mr. Hall shall recover the past

8

medical expenses as proven reasonable and necessary by Dr. Wright's testimony in the total amount of $16,058. (*See* Ex. 7 at 12-13.)

*Temporary Disability Benefits*

Under Tennessee law, to establish entitlement to temporary total disability (TTD) benefits, Mr. Hall must show he (1) was totally disabled to work by a compensable injury; (2) that there was a causal connection between the injury and his inability to work; and (3) the duration of that period of disability." TTD benefits terminate when an employee demonstrates the ability to return to work or attains MMI. *Jones v. Crencor Leasing and Sales*, No. 2015-06-0332, 2015 TN Wrk. Comp. App. Bd. LEXIS 48, at *7 (Tenn. Workers' Comp. App. Bd. Dec. 11, 2015). Temporary partial disability (TPD) "refers to the time, if any, during which the injured employee is able to resume some gainful employment but has not reached maximum recovery." *Id.* at *8. Thus, in circumstances where the treating physician has released the injured worker to return to work with restrictions and the employer either (1) cannot return the employee to work within the restrictions or (2) provides restricted work for a lower wage than the employee's average weekly wage, the injured worker may be eligible for temporary partial disability. *Id.* The weekly rate for TPD is calculated by multiplying by two-thirds the difference between the employee's average weekly wage and the wage he was able to earn in his partially disabled condition. Tenn. Code Ann. § 50-6-207(2)(A) (2015).

Mr. Hall alleges entitlement to temporary disability benefits for two periods: first, from October 2, 2014, through February 16, 2015, the period between his date of termination from Mid-South until he obtained new employment at H&M; and second, the period between March 9, 2015, and April 7, 2015, when he was off work following his knee surgery.

Regarding the first requested period of October 2, 2014, through February 2, 2015, the Court cannot award TTD as Mr. Hall has not shown he was totally disabled from working; rather, he labored under restrictions. However, the Court finds he is entitled to TPD for that period. The parties stipulated Mr. Hall's compensation rate was $708.50 per week. They further stipulated he did not work between his termination and his obtaining new employment.

The Court finds Mr. Hall is entitled to TPD because there is inadequate proof of why Mid-South terminated him for alleged "attendance issues." Though it cited that its employee handbook allowed discipline "up to and including termination" for three unexcused absences, it did not establish which three days resulted in Mr. Hall's termination. Likewise, it produced no witness to refute Mr. Hall's testimony that he "called in" when he missed work or his testimony that he always told Mid-South he was leaving early because of his knee. Mr. Bracamonte candidly testified he did not know the details of any excuses tendered by Mr. Hall, and the employee charged with discipline

9

did not testify. Additionally, with no history of disciplinary issues, there is no proof as to why Mid-South imposed upon Mr. Hall the most serious sanction of termination.

Mid-South cites *Mace v. Express Services, Inc.*, No. 2015-06-0059, 2015 TN Wrk. Comp. App. Bd. LEXIS 49 (Tenn. Workers' Comp. App. Bd. Dec. 11, 2015) in support of its position that it "may enforce workplace rules" without incurring liability for TPD. The Court agrees with this general proposition. However, *Mace* is distinguishable. There, the trial court found the employee did in fact violate workplace rules supporting his termination. Here, as stated above, Mid-South did not refute Mr. Hall's testimony that he properly provided excuses for his missed days due to his knee. Accordingly, the Court finds Mr. Hall is entitled to TPD for the period of October 2, 2014, his termination date from Mid-South, until February 2, 2015, his date of re-employment.

The Court finds Mr. Hall is entitled to TTD for the second requested period, the time he was off work following his surgery as ordered by Dr. Wright. (Ex. 7 at 12.) During that time, Mr. Hall established he was totally disabled from work by his compensable injury, a causal connection between his injury and inability to work, and the duration of the period of disability. His return to work on April 7, 2015, marks the termination date of his entitlement to TTD. *Jones*, at *7.

*Permanent Partial Disability Benefits*

For post-July 1, 2014 injuries, permanent partial disability is paid at sixty-six and two-thirds percent of the injured employee's average weekly wage for the period of compensation as determined by multiplying the employee's impairment rating by 450 weeks. Tenn. Code Ann. § 50-6-207(3)(A) (2015). These benefits are payable "whether the employee has returned to work or not." *Id.* Hence, the first issue for resolution is a determination of the proper impairment rating.

Drs. Wright and Pearce each assessed a one percent permanent partial impairment to the body as a whole. (Ex. 7 at 26-27; Ex. 12 ex. 2 at 2.) They utilized the AMA Guides section for rating partial meniscectomies. Dr. Chung assessed a five percent to the body as a whole. He based his rating on arthritis. Our courts have noted that the AMA Guides provide physicians "with multiple methods of assessing medical impairment." *Beeler v. Lennox Hearth Prods.*, No.W2007-02441-SC-WCM-WC, 2009 Tenn. LEXIS 27, at *12 (Tenn. Workers' Comp. Panel Feb. 18, 2009).

In resolving the issue, the Court considers Mr. Hall's argument that Dr. Pearce was an "authorized" physician but not necessarily a "treating" physician whose rating is presumed correct subject to rebuttal by a preponderance of the evidence. *See* Tenn. Code Ann. § 50-6-204(k)(7) (2015). He argues this is a "question of fact." He further argues that Dr. Wright is more accurately the "treating" physician.

10

The Court need not address Mr. Hall's argument that Dr. Wright is the true "treating physician" because both Drs. Wright and Pearce assessed the same rating. Even if the Court were to question Dr. Pearce's standing as the treating physician, Dr. Wright would assume the role of treating physician. Either way, the Court would presume as correct an impairment of one percent to the body. Moreover, regardless of any presumption, the Court finds the preponderance of the evidence supports an impairment of one percent.

First, two doctors agree to the correctness of a one percent to the body rating. Second, the methodology of Drs. Wright and Pearce is sounder than that of Dr. Chung. They explain the AMA Guides specifically list a partial meniscectomy on Table 16-3 on page 509. (Ex. 7 at 26-27; Ex. 12, ex. 2 at 2.) Conversely, Dr. Chung looks to a diminished cartilage interval, indicative of arthritis, for his rating. (Ex. 8 at 12.) Admittedly, Mr. Hall has arthritis in his left knee. But, Dr. Chung admits Mr. Hall would have had some degree of arthritis before his injury and concedes he cannot quantify the decrease of the "cartilage interval" because of the injury. (Ex. 8 at 32-33.) Dr. Pearce, an orthopedic surgeon who performs knee surgeries, testified the x-ray view relied upon by Dr. Chung cannot show the decreased interval used to assess his five percent rating. (Ex. 12 at 27, 29.) Finally, Dr. Chung conceded the AMA Guides provide a specific rating of one percent for a partial meniscectomy, the surgical procedure at issue. (Ex. 8 at 34.)

Accordingly, the Court finds Mr. Hall sustained a one percent permanent partial disability to the body as a whole and is entitled to four and one-half weeks of benefits at his stipulated compensation rate.

The parties stipulated Dr. Wright placed Mr. Hall at MMI on May 26, 2015. Accordingly, Mr. Hall's initial benefit period expired on June 27, 2015, four and one-half weeks later. *See* Tenn. Code Ann. § 50-6-207(3)(A) (2015). Mr. Hall testified he worked for H&M Construction, his subsequent employer, until "September or October" 2015. Hence, he was working at the expiration of his initial benefit period. Because Mr. Hall had returned to work at an equal or greater wage than he earned at the time of his injury, he is not entitled to any of the enhanced benefits provided by Tennessee Code Annotated section 50-6-207(3)(B) (2015).

*Future Medical Benefits*

An employer is responsible for reasonable and necessary medical care resulting from an employee's work-related injury regardless of whether the injury results in permanent disability. Tenn. Code Ann. § 50-6-204(b)(1) (2015); *Barron v. State Dep't of Human Servs.*, 184 S.W.3d 219, 223 (Tenn. 2006); *Stephens v. Henley's Supply & Indus., Inc.*, 2 S.W.3d 178, 179-180 (Tenn. 1999). Having found Mr. Hall sustained a compensable injury, Mid-South is responsible for reasonable and necessary future

11

medical benefits causally related to his injury of September 3, 2014. Mid-South shall provide a panel of physicians from which Mr. Hall may choose a physician to provide future medical treatment.

*Discretionary Costs and Attorney's Fees*

At the hearing, the parties and the Court discussed the issue of discretionary costs. The Court finds this to be an appropriate case for the award of such costs. If the parties are unable to agree to the proper amount of discretionary costs, the Court will entertain an appropriate motion.

The Court finds counsel for Mr. Hall is entitled to a reasonable attorney's fee for his representation of Mr. Hall in this case. Tennessee Code Annotated section 50-6-226(a)(1) (2015) provides such attorney's fee shall be deemed reasonable if it "does not exceed twenty percent (20%) of the award to the injured worker." Accordingly, the Court finds counsel for Mr. Hall is entitled to a fee of twenty percent of the recovery of temporary total, temporary partial, and permanent partial disability benefits.

**IT IS, THEREFORE, ORDERED** as follows:

1. Mid-South shall pay for past medical care for Mr. Hall's injuries in the amount of $16,058. Mr. Hall shall furnish any outstanding bills of Jackson-Madison County General Hospital, Sports Orthopedics and Spine and/or the anesthesia provider to Mid-South for payment. Mid-South shall hold Mr. Hall harmless from any attempts at reimbursement of amounts paid by other insurance sources.

2. The rate for temporary total disability benefits is $708.50 per week as stipulated by the parties. Mid-South shall pay past due temporary total disability benefits of $3,131.57 for the period of March 9, 2015, to April 7, 2015, a period of four weeks and three days. Mr. Hall's counsel is awarded an attorney's fee of twenty percent of said recovery.

3. The Court finds the rate for temporary partial disability benefits is $708.50 per week. Mid-South shall pay past due temporary partial benefits of $12,342.07 for the period of October 2, 2014, to February 2, 2015, a period of seventeen weeks and three days. Mr. Hall's counsel is awarded an attorney's fee of twenty percent of said recovery.

4. The rate for permanent partial disability benefits is $708.50 per week as stipulated by the parties. Pursuant to Tennessee Code Annotated section 50-6-207(3)(A) (2015), Mr. Hall is entitled to 450 weeks times the appropriate impairment rating of one percent, which equates to four and one-half weeks of benefits. At the stipulated rate of $708.50 per week, this equals $3,188.25 in permanent partial disability benefits. Mr. Hall's counsel is awarded an attorney's fee of twenty percent of said recovery.

12

5. At the conclusion of the initial benefit period on June 27, 2015, Mr. Hall had returned to work with another employer earning a wage greater than the wage he was earning at the time of injury. Therefore, he is not entitled to any of the enhancement factors of Tennessee Code Annotated section 50-6-207(3)(B) (2015).

6. Mid-South shall pay reasonable and necessary future medical expenses pursuant to Tennessee Code Annotated section 50-6-204(b)(1) (2015) as may be causally related to Mr. Hall's injury of September 3, 2014. Because Mid-South did not provide a panel of physicians, it shall provide future medical treatment with Dr. Wright.

7. Mr. Hall is entitled to discretionary costs pursuant to Tennessee Code Annotated section 50-6-239(c)(8) (2015) and Tennessee Rule of Civil Procedure 54.04(2) (2015). If the parties cannot agree regarding the amount of said costs, then the Court will entertain an appropriate motion.

8. After a Compensation Hearing Order entered by a Workers' Compensation Judge has become final in accordance with Tennessee Code Annotated section 50-6-239(c)(7) (2015), compliance with this Order must occur in accordance with Tennessee Code Annotated section 50-6-239(c)(9) (2015). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the fifth business day after this Order becomes final or all appeals are exhausted. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.

8. The filing fee for this cause of $150.00 is taxed to Mid-South pursuant to Rule 0800-02-21-.07 (2015) of the Tennessee Compilation Rules and Regulations to be paid within five days of the date of this Order.

**ENTERED this the 10th day of June, 2016.**

_____

**Judge Allen Phillips**
**Court of Workers' Compensation Claims**

Right to Appeal:

Tennessee Law allows any party who disagrees with this Compensation Hearing Order to appeal the decision to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal your case to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Compensation Hearing Notice of Appeal."

2. File the completed form with the Court Clerk *within thirty days* of the date the Workers' Compensation Judge entered the Compensation Hearing Order.

3. Serve a copy of the Compensation Hearing Notice of Appeal upon the opposing party.

4. The appealing party is responsible for payment of a **filing fee in the amount of $75.00.** Within ten calendar days after the filing of a notice of appeal, payment must be received by check, money order, or credit card payment. Payments can be made in person at any Bureau office or by United States mail, hand-delivery, or other delivery service. In the alternative, the appealing party may file an Affidavit of Indigency, on a form prescribed by the Bureau, seeking a waiver of the filing fee. The Affidavit of Indigency may be filed contemporaneously with the Notice of Appeal or must be filed within ten calendar days thereafter. The Appeals Board will consider the Affidavit of Indigency and issue an Order granting or denying the request for a waiver of the filing fee as soon thereafter as is practicable. **Failure to timely pay the filing fee or file the Affidavit of Indigency in accordance with this section shall result in dismissal of the appeal.**

5. The party filing the notice of appeal, having the responsibility of ensuring a complete record on appeal, may request, from the Court Clerk, the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within fifteen calendar days of the filing of the Compensation Hearing Notice of Appeal. Alternatively, the party filing the appeal may file a joint statement of the evidence within fifteen calendar days of the filing of the Compensation Hearing Notice of Appeal. The statement of the evidence must convey a complete and accurate account of what transpired in the Court of Workers' Compensation Claims and must be approved by the workers' compensation judge before the record is submitted to the Clerk of the Appeals Board. *See* Tenn. Comp. R. & Regs. 0800-02-22-.03 (2015).

6. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Workers' Compensation Appeals Board, the appeal will be docketed and assigned to an Appeals Board Judge for review. At that time, a docketing notice shall be sent to the parties. Thereafter, the parties have fifteen calendar days to submit briefs to the Appeals Board for consideration. *See* Tenn. Comp. R. & Regs. 0800-02-22-.02(3) (2015).

To appeal your case directly to the Tennessee Supreme Court, the Compensation Order must be "final" (*see* Tennessee Code Annotated section 50-6-239(c)(7) (2015)) and you must comply with the Tennessee Rules of Appellate Procedure.

# APPENDIX

Exhibits:
1. Employment Application at H&M Construction;
2. Form C-42 Choice of Physician;
3. Form C-23 Notice of Denial;
4. Mid-South Employee Handbook and Mr. Hall's acknowledgement of same;
5. H&M new employee information form;
6. Dr. Pearce's Review of Systems Form, October 14, 2015;
7. Deposition of Dr. Bradford Wright;
8. Deposition of Dr. Samuel Chung;
9. Mid-South's "Employee Time History" of Mr. Hall;
10. Mr. Hall's Time Sheets from September 14, 2014, until his termination;
11. Separation Notice; and,
12. Deposition of Dr. David Pearce.

Technical record:[2]
1. Petition for Benefit Determination, September 10, 2015;
2. Dispute Certification Notice, May 4, 2016;
3. Request For Initial Hearing, December 16, 2015;
4. Parties' Pre-Compensation Hearing Statement;
5. Employer's List of Witnesses and Exhibits;
6. Employee's Trial Brief; and,
7. Pre-Trial Brief of Employer.

---

[2] The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Compensation Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence. The Court noted additional issues in the DCN, but neither party introduced evidence regarding those issues.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Compensation Hearing Order was sent to the following recipients by the following methods of service on this the 10th day of June, 2016.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|---|---|---|---|---|
| David Hardee, Esq. Employee's Counsel | | | X | dhardee@hmdlaw1.com |
| Paul Todd Nicks, Esq. Employer's Counsel | | | X | pnicks@travelers.com |

Penny Shrum, Clerk of Court
**Court of Workers' Compensation Claims**
WC.CourtClerk@tn.gov